Simon F. MACKINTOSH, Appellant,

v.

TEXAS EMPLOYERS INSURANCE
ASSOCIATION, Appellee.

No. 17938.

Court of Civil Appeals of Texas,
Dallas.

Sept. 28, 1972.

Rehearing Denied Oct. 19, 1972.

Sammy D. Sparks, Seale & Stover, Jasper, for appellant.

Edward E. Crowell, Jr., Gardere, Porter & DeHay, Dallas, for appellee.

CLAUDE WILLIAMS, Chief Justice.

Simon Mackintosh brought this action against Texas Employers Insurance Association seeking to set aside and cancel a compromise and settlement agreement relating to a claim under the Workmen's Compensation Law of Texas. Mackintosh alleged that while in the scope and course of his employment for Burris Transfer and Storage Company, Inc., on August 9, 1969 he sustained an injury to his hand and that he seasonably filed his claim with the Industrial Accident Board of Texas to recover workmen's compensation benefits allowed for such injury. He alleged that through fraud and/or mistake he was induced to enter into and execute a compromise settlement agreement wherein he would have received the sum of $376 (in addition to $301 previously paid) in complete settlement of his claim. He charged that the insurance company's adjuster and agent caused him to settle his claim by representing to him that $376 was the maximum amount which he could recover under the law for his injury whereas the injury sustained by him was of such a nature as would entitle him to a larger amount of compensation.

The case was tried to a court and a jury. In response to special issues the jury found that on August 9, 1969 Mackintosh had sustained an injury to his right hand while in the course and scope of his employment and that such injury resulted in total loss of use of such hand from August 11, 1969 until September 22, 1969. The jury then found that the injured employee had sustained a permanent partial loss of use of his right hand, beginning September 22, 1969, to the extent of 75 per cent. The jury specifically found that the loss of use of the employee's right hand did not result solely from the loss of use of the index finger. In response to Issues 20 and 21 the jury found that the adjuster or agent for the insurance company was knowledgeable of the Workmen's Compensation Law of the State of Texas at the time the compromise settlement was entered into but that Mackintosh was not knowledgeable of such law at that time. In response to Special Issue No. 22 the jury found that Mackintosh relied on the insurance company's agent, McDaniel, when he represented that $376 was the maximum additional amount to which Mackintosh was entitled under the Workmen's Compensation Law. In answer to Special Issue No. 23 the jury found that at the time the settlement was made McDaniel did not know that plaintiff's disability was greater than 20 per cent permanent partial disability as applied to the right index finger.

Mackintosh, in his motion for judgment, asked the court to set aside and disregard the answer of the jury to Special Issue No. 23 as being immaterial and to render judgment in his favor decreeing that the compromise settlement agreement should be set aside and held to be null and void.

The trial court rendered judgment, based upon the verdict, denying Mackintosh any relief, leaving the compromise settlement agreement in full force and effect.

Appellant Mackintosh advances a number of points on appeal but primarily contends that the trial court was in error in rendering judgment based upon the answer of the jury to Special Issue No. 23 in that such issue, and the jury's answer thereto, were immaterial and could not, as a matter of law, constitute the basis of a judgment defeating appellant's claim of fraud and/or mistake.

Resolution of the questions presented requires a condensed statement of the relevant facts which are essentially undisputed.

Mackintosh, a native of Scotland, age 72, with a fifth grade education, has performed manual labor requiring the use of his hands during the course of his active life. On August 9, 1969, while working for his employer, a toy truck fell from a closet shelf and struck the back of his right hand.

He filed notice of injury and claim for compensation with the Industrial Accident Board and it was stipulated that his average weekly wage was not less than $85. The injury occurred at Jasper, Texas about 11:00 o'clock in the morning and he continued work that day. He came back to work on Monday at Beaumont and tried to work but could not because his hand was hurting. He told his foreman about the condition of his hand and the foreman told him to go to see "his doctor". He went to the company doctor but found that he was not in the office. When asked what happened when the doctor wasn't there he replied, "He just said to go to the doctor's office in Beaumont and I got ahold of a bone specialist." He went to a doctor's hospital and asked for a bone specialist and was referred to Dr. Alexander. Dr. Alexander examined him and put a splint on his finger but did not tell him what was wrong with him that day. He reported to the office of the insurance company in Beaumont where he gave information concerning his injury. About two weeks later he saw Dr. Alexander at which time he removed the bandages and x-rayed his hand. The doctor told him that "the bones and the knuckles were all broke." Mackintosh stated that his entire hand was swollen and especially his right index finger knuckle. There is no evidence in this record that Dr. Alexander ever gave Mr. Mackintosh a written report concerning his condition nor is there any evidence as to who paid Dr. Alexander's fee.

Mackintosh went to the office of the insurance company on September 22, 1969 and talked with Mr. McDaniel, the agent or adjuster for the insurance company. McDaniel gave him a check for $301 which he said was for back pay. This amount was equivalent to compensation for a period of six weeks and one day. Mackintosh then testified:

"Q   Then after he gave you the check for six weeks back pay, what did he say to you then?

A   Then he told me if you want to sign the agreement now, or you are only allowed twenty percent on the finger. I told him I may as well if that is all I would get, I may as well take it.

Q   Mr. Mackintosh, did he tell you that twenty percent was based on a doctor's report?

A   Yes, sir.

Q   Did he tell you it was Dr. Alexander's report?

A   Yes, sir.

Q   Mr. Mackintosh, did he tell you an amount of money that you were entitled to?

A   He told me I would get $376.00 sent to me.

Q   He didn't give it to you right then?

A   No, sir.

Q   Mr. Mackintosh, did he tell you that was the maximum amount you were entitled to under the law in addition to what you had already gotten?

A   Yes, sir.

Q   Okay, Mr. Mackintosh, do you have any knowledge yourself of the Workmen's Compensation Law?

A   No, not a bit.

Q   Mr. Mackintosh, did Mr. McDaniel tell you that this is what the law said?

A   What the law allowed.

Q   Did you believe him?

A   Yes, sir, I believed the doctor, too.

Q   Mr. Mackintosh, at the time that this occurred, did he ask you to let you look at your hand and did he look at your hand?

A   I showed him my hand."

At this juncture photographs were introduced in evidence which revealed a swelling of the right index finger knuckle.

Mackintosh denied that Dr. Alexander had released him to return to work but stated that Mr. McDaniel told him that he could go back to work. He said that at the time he signed the compromise settlement agreement he was not able to return to work due to the injury to his hand. He then related facts with reference to his efforts to work following the agreement and the continued disability as applied to his right hand. On cross-examination he said:

"Q At the time you signed this form, you told us your hand was swollen?

A Yes, sir.

Q And you knew your knuckle was bothering you then, didn't you?

A I knew my knuckle was broke all along.

Q And if anybody told you only your finger was hurt, you would know that wasn't true?

A I knew it wasn't true."

On further cross-examination he reiterated that he had relied upon McDaniel's statement that the sum to be paid him was the total amount that he could recover under the Workmen's Compensation Law. After the agreement had been signed he was examined by Dr. Popejoy on two occasions. Dr. Lee T. Popejoy testified that in his opinion Mackintosh had total and and permanent loss of use of his right hand as a result of the injury of August 9, 1969.

Mr. James A. McDaniel, an adjuster and agent for the insurance company, had had extensive experience in handling workmen's compensation claims. He was the senior adjuster in the Beaumont office at the time Mackintosh's claim was handled. He was thoroughly familiar with the Workmen's Compensation Law. He saw Mackintosh on one occasion prior to September 22, 1969. On September 22 he paid Mackintosh for six weeks and one day compensation amounting to $301. This was based on an average daily rate of $17 for temporary total disability. He said that the compensation allowed for the loss of the index finger was forty-five weeks whereas loss of the hand would be compensated for one hundred and fifty weeks.

McDaniel said that at the time the settlement was made on September 22, 1969 he had received a report from Dr. Alexander but not the doctor's final report. Prior to the settlement he had had other reports from Dr. Alexander in narrative form but these did not express any opinion concerning percentage of disability. He said when he talked to Mackintosh about settlement he called Dr. Alexander's office and was told by either Dr. Alexander or one of his nurses that the percentage of disability to Mackintosh's finger was 20 per cent. He said he based his evaluation of the case on the doctor's report. He admitted at that time he looked at Mackintosh's hand and saw that it was injured. He looked at the knuckle and saw that it was swollen. He computed the value of 20 per cent permanent partial loss of use of the right index finger as being $376. He admitted that if the man had a total loss of use of the hand he would have been entitled to one hundred and fifty weeks or the total sum of approximately $7,000.

McDaniel admitted that under the Workmen's Compensation Law in force at the time, the loss of the metacarpal bone or palm for the corresponding finger would be compensated by an additional ten weeks to the number of weeks provided for the loss of use of the particular finger. He stated, however, that he relied upon Dr. Alexander's report that the injury was confined to the finger, even though he admitted that he saw and observed Mr. Mackintosh's knuckle. He said that he paid Mackintosh on the theory that the injury would not heal.

The written opinion of Dr. Alexander, dated November 11, 1969, and filed with the Industrial Accident Board in support of the compromise settlement agreement, states that a large toy truck had fallen on Mr. Mackintosh's right hand "striking the

back of his right hand. Fracture, metacarpal phalangal joint of the right hand." It further states that "x-ray showed fracture, metacarpal phalangal joint of the right hand", and concludes by saying that the permanent partial disability as a result of the injury was "twenty per cent applied to right index finger."

In the light of these facts we turn to the applicable law. In an action to set aside a compromise settlement agreement on the grounds of fraud or mistake the common law rules applicable to suits for rescission and cancellation are applicable. Texas Employers Insurance Ass'n v. Kennedy, 135 Tex. 486, 143 S.W.2d 583 (1940); Traders & General Ins. Co. v. Bailey, 127 Tex. 322, 94 S.W.2d 134 (1936).

"In order for a plaintiff to have the release cancelled he must show, among other things, the false representations and that they were made by the defendant or his duly authorized agents; that plaintiff relied upon such representations; that he has been injured, that is, that he has a meritorious claim for compensation, and he must make a tender or show that his injury is greater than the amount paid or other facts which excuse a return of the amount plaintiff received when he executed the release sought to be set aside." Brannon v. Pacific Employers Ins. Co., 148 Tex. 289, 224 S.W.2d 466 (1949).

As stated by the text writer in 25 Tex. Jur.2d, "Fraud and Deceit", § 1, p. 613, it is not practicable to formulate a general rule that will set forth all the circumstances in which representations may amount to fraud. It has also been said that fraud is an elusive term and so multiform as to admit of no rules or definitions so that equity leaves the way open to punish frauds and to redress wrongs perpetrated by means of fraud in whatever form it may appear. However, the courts of our state have drawn a clear distinction between actual or intentional fraud on the one hand and legal or constructive fraud on the other. Thus it has been said that actual or intentional fraud implies deceit, artifice, and design and imports the active operation of the mind so that it consists of deception intentionally practiced to induce another to part with property or surrender some legal right. The feature that distinguishes actual fraud from other kinds of fraud is the dishonest intention. On the other hand, constructive fraud, sometimes referred to as "legal fraud" applies to those transactions that the law declares to be fraudulent irrespective of the intention or guilt of the fraud-feasor, because they are opposed to statute, to public policy, or to good morals, because of the circumstances and conditions of the immediate parties to the transaction. 25 Tex.Jur.2d, "Fraud and Deceit", § 5, pp. 618–619.

A large number of Texas cases, and cases from other jurisdictions, have dealt with the situation in which it was contended that the injured party, in executing the release, relied upon representations of the releasee or the releasee's agent as to the nature and extent of the injuries. Most of the courts faced with the question have agreed that if the evidence supports this contention, and also shows that the injuries were more extensive or serious than supposed, the release can be avoided, even though there may have been no intention to deceive the releasor, such an innocent misrepresentation being taken as evidence of a mutual mistake or of what is sometimes called "constructive fraud". Graves v. Hartford Accident & Indemnity Co., 138 Tex. 589, 161 S.W.2d 464 (1942); Kennedy v. Texas Employers Ins. Ass'n, 121 S.W.2d 434 (Tex.Civ.App., Dallas 1938, affirmed 135 Tex. 486, 143 S.W.2d 583); Jones v. Traders & General Ins. Co., 188 S.W.2d 739 (Tex.Civ.App., Eastland 1945); General Accident Fire & Life Assur. Corp. v. Marker, 298 S.W.2d 848 (Tex.Civ.App., Galveston 1957, writ ref'd n. r. e.); and Archer v. Griffith, 390 S.W.2d 735 (Tex. Sup.1964). See also cases collated in 71 A.L.R.2d 118–126.

It is quite obvious that the purpose of submitting Special Issue No. 23 to the

jury was to establish that appellee's agent, McDaniel, had a culpable state of mind with reference to the percentage of disability at the time the settlement agreement was consummated. As held in the authorities cited it was not essential to appellant's cause of action that he establish knowledge on the part of McDaniel that the injury sustained would result in a greater percentage of disability than that expressed by Dr. Alexander. Appellant established facts constituting legal fraud regardless of the lack of culpable purpose on the part of McDaniel. It was undisputed that Mackintosh relied upon what McDaniel told him to be the maximum recovery under the Workmen's Compensation Law of Texas for his disability. It is also established that McDaniel, in making the representation relied upon an opinion expressed to him by Dr. Alexander. The jury found that Mackintosh had sustained a serious injury which would result in a much greater percentage of permanent disability than that expressed by Dr. Alexander. Thus it was conclusively established that the representation made by McDaniel was false (though made by him without knowledge of such falsity) and that Mackintosh relied upon such representation to his loss and detriment. Accordingly, it follows that the answer of the jury to Special Issue No. 23 concerning McDaniel's lack of knowledge is immaterial on the issue of constructive fraud and cannot form the basis of a judgment denying appellant's petition for relief.

Appellee takes the position that regardless of McDaniel's knowledge or lack of knowledge concerning the extent of disability the judgment must stand because McDaniel made his representation to Mackintosh based upon an opinion concerning disability coming from Dr. Alexander who was, according to appellee, the doctor chosen and selected by Mackintosh so that he is bound by such doctor's opinion. Throughout the brief appellee refers to Dr. Alexander as appellant's "own doctor, whom he personally selected". Appellee argues that appellant knew and realized that McDaniel was relying upon the report of Dr. Alexander in determining the amount of compensation to which appellant was entitled and that being his "own doctor" appellant could not complain of the falsity of such medical opinion transmitted to him by McDaniel. Appellee concedes that Dr. Alexander's opinion was incorrect in view of the jury's finding of 75 per cent partial disability but seeks to evade the charge of fraudulent misrepresentation by pointing to the fact that Dr. Alexander was appellant's "own doctor". In this regard appellee points to such cases as Brannon v. Pacific Employers Ins. Co., 148 Tex. 289, 224 S.W.2d 466 (1949); Bullock v. Texas Employers Ins. Ass'n, 254 S.W.2d 554 (Tex. Civ.App., Dallas 1952); Texas Employers' Insurance Ass'n v. Williams, 447 S.W.2d 232 (Tex.Civ.App., Houston 14th Dist. 1969); and a number of other cases which follow the general rule that the alleged fraudulent misrepresentation must have been made by an agent or representative of the insurance company.

While we do not question the correctness of the general rule relied upon by appellee we do not feel that the authorities cited are controlling of the factual situation here presented. It must be borne in mind that after Mackintosh was injured he reported to his foreman who directed him to go to the company doctor at Beaumont. Mackintosh went to the office of the company doctor and was told that such doctor was not in. He then made inquiry as to what he should do and was told to go to a bone specialist. He went to a hospital and asked to see a bone specialist and was referred to Dr. Alexander. Dr. Alexander saw him on two occasions but he never advised appellant concerning the extent of his injuries. He never at any time gave appellant a written report concerning his condition nor is there any evidence that appellant paid the doctor his fee. On the other hand, it is undisputed that McDaniel received from Dr. Alexander two narrative reports and advised McDaniel concerning the estimate of 20 per cent disability as applied to the finger. It is also undisputed

that the insurance company, acting through McDaniel, secured a written report from Dr. Alexander and filed the same with the Industrial Accident Board to support the compromise settlement agreement entered into on a previous date.

We think that these facts and circumstances bring the case clearly within the rule announced in Jones v. Traders & General Ins. Co., 188 S.W.2d 739 (Tex.Civ. App., Eastland 1945). In that case the injured employee went to his family doctor who in turn referred him to Dr. Egdorf in Wichita Falls, Texas, who made a written report to the insurance company which was made the basis of a compromise settlement agreement. In a suit to set aside this agreement for fraudulent representation the insurance company contended that Dr. Egdorf was not its agent but was the doctor selected by the claimant. The court in refusing to accept this argument said:

"Appellee further contends there was no proof that Dr. Egdorf was an agent of appellee or had authority to make any statement that would be binding upon appellee. This contention is overruled. Appellee attached the letter from Dr. Egdorf to the settlement papers and made it a part of the same and used said letter in bringing about the settlement of appellant's claim. It is true, as contended by appellee, that Dr. Frizzel was the family physician of appellant. He was also the doctor that had been selected by the Gin Company to look after its injured employees. Dr. Frizzel, not being an eye specialist, sent appellant to Dr. Egdorf at Wichita Falls. Plaintiff testified that Dr. Frizzel or Dr. Egdorf never called on him for any pay for their services. As will be seen, the letter attached to the settlement papers signed by Dr. Egdorf was addressed to the Traders & General Insurance Company, appellee herein. At most, an issue of fact was raised as to whether Dr. Egdorf was acting for the appellee, the Insurance Company. However, we deem that issue immaterial, for the reason that the Insurance Company

used the statements of Dr. Egdorf in effecting the settlement and accepted the benefits derived therefrom. Bertha v. Regal Motor Car Co., 180 Mich. 51, 146 N.W. 389."

The same situation appears in Continental Casualty Co. v. Lynch, 257 S.W.2d 778 (Tex.Civ.App., Eastland 1953), which involved an action to set aside a compromise settlement agreement. In that case the claimant went to a hospital and the doctor was one of his own choice but the court held, citing Jones v. Traders & General Ins. Co., supra, that the statement of the doctor was used by the agent of the insurance company in making the claim and that the claimant had a right to believe that the doctor knew the nature and extent of his injury.

An analogous situation is found in Vineyard v. Texas Employers' Ins. Ass'n, 263 S.W.2d 675 (Tex.Civ.App., Dallas 1953, writ ref'd n. r. e.), in which the injured employee was examined and treated by Dr. Brown, who was the doctor used by the employer. The insurance company used Dr. Brown's report in making a compromise settlement with the employee. In an action to set aside the compromise settlement agreement the insurance company took the position, as it does here, that Dr. Brown was not its agent so that it was not bound by his opinion which was shown to be false. This court, speaking through Mr. Justice Cramer, refused to accept this argument saying:

"In our opinion under the above evidence the Association was charged with the correctness of the statement of Dr. Brown when it used such statement in making the settlement, and the evidence here raises the issue as to the correctness of such statement for the jury. * * *

"This case differs from Bullock v. Texas Employers' Ins. Ass'n, Tex.Civ. App., 254 S.W.2d 554, cited by appellant. The doctor in the Bullock case was the doctor of the employee; here, as stated above, the doctor was not the doctor of

employee Vineyard, but the doctor of his (Vineyard's) employer. The use of the employer's doctor's first oral opinion and later his written statement by the insurer to influence the settlement, and as asserted by Vineyard, did influence him to his damage, was in effect an adoption by the insurer of the statements of such employer's doctor, and made such statements binding on the insurer in the settlement with Vineyard."

Appellee relies upon the case of Texas Employers' Ins. Ass'n v. Williams, 447 S. W.2d 232 (Tex.Civ.App., Houston 14th Dist.1969), but a careful reading of this case demonstrates that it is easily distinguishable. In that case there was a question of whether Dr. King was appellant's agent at the time the misrepresentation was made. However, the court held that there was no evidence in the record to show that Dr. King's alleged mistake or misrepresentation was used by the adjusters in effecting the settlement or that such doctor's statement was ever mentioned to the injured employee which led to the settlement.

We are convinced that the judgment cannot stand based upon the answer of the jury to Special Issue No. 23 concerning lack of knowlege on the part of the insurance company's adjuster McDaniel concerning the nature and extent of appellant's disability. We are also of the opinion that the representation of Dr. Alexander, used by the insurance company to effect the settlement, was such as to constitute constructive or legal fraud which will vitiate the compromise settlement agreement.

Appellee has brought forward six cross-points of error dealing with the question of no evidence and insufficient evidence to support the answer of the jury to Special Issue No. 22. We have carefully considered each of these cross-points and find the same to be lacking in merit and overrule the same.

The judgment of the trial court is reversed and judgment is here rendered that the compromise settlement agreement made and entered into on September 22, 1969 between Simon Mackintosh and Texas Employers Insurance Association, and approved by the Industrial Accident Board on December 9, 1969, be and the same is hereby set aside, cancelled, and held for naught.

Reversed and rendered.