Holley Evans HOWARD and
Sarah Donaldson,

v.

CHRIS–CRAFT CORPORATION, et al.

No. TY–80–407.

United States District Court,
E.D. Texas,
Tyler Division.

Sept. 24, 1982.

Leonard E. Davis, John H. Minton, Douglas R. McSwane, Jr., Potter, Guinn, Minton, Roberts & Ireland, Tyler, Tex., for plaintiffs.

David W. Ledyard, Strong, Pipkin, Nelson, Parker & Bissell, Beaumont, Tex., for defendants.

Robert Keith Drummond, Strasburger & Price, Dallas, Tex., for Outboard Marine Corp.

Tom Stollenwerck, Dallas, Tex., for Ins. Co.

*Memorandum Opinion*

JUSTICE, Chief Judge.

Plaintiffs filed this products liability suit on November 7, 1980, for personal injuries sustained in a boating accident. Before the court is plaintiffs' motion to enforce a settlement agreement that the parties agree was entered into on August 19, 1982. For the reasons set forth below, the motion will be granted.

## I.

### History of the Case

The plaintiffs are two young women who took a ride on Lake Tyler on July 5, 1980, in a boat manufactured by defendants. Their allegations are summarized, as follows: The defective design of the boat would cause it to tilt upward at a steep angle, greatly impairing forward visibility, at least until the boat achieved a very high rate of speed—about 30 m.p.h.—at which time it would "plane out." Because it was impossible to see adequately at a pre-planing speed while sitting in the seats provided, plaintiffs had to sit instead on the top of the backs of those seats. When that boat was hit by the wake of another boat, both plaintiffs were thrown into the water. The boat

was defective, in that it was not equipped with a relatively simple safety device, called a "kill switch", which would have automatically cut the engine when the driver was thrown out of the boat. Instead, the boat continued running and pulled into a tight circle, repeatedly running over both women with its propeller, permanently disfiguring both and almost killing them. Plaintiff Holley Howard, who was to have begun work in a few weeks as a dance instructor and part-owner of a dance studio, lost her leg.

Defendants prepared to defend the case by alleging, *inter alia,* misuse of equipment, assumption of the risk, and contributory negligence. In addition, they filed a counterclaim against the driver of the boat, plaintiff Holley Howard, for indemnification or contribution for any damages they might be found to owe plaintiff Sarah Donaldson. They had expert witnesses available and ready to testify that the accident could not have happened as the women had described it. They intended to argue, among other things, that the women were under the influence of alcohol (both had admitted to drinking about two and a half alcoholic drinks over the four hours preceding the accident), that they were seated precariously (also admitted by plaintiffs), and that they were operating the boat at an unsafe speed. (See Pre-Trial Order, Contentions of Chris-Craft.)

After some eighteen months of extensive discovery, including the taking of over thirty depositions, the case was set for trial on the August 1982 docket in the Tyler Division, with jury selection to take place August 20, 1982. On August 18, 1982, David Ledyard, Esquire, lead counsel for defendants Chris-Craft Corporation and Chris-Craft Industries, Inc. ("Chris-Craft"), offered to plaintiffs a settlement of $1,040,-000. It is undisputed that Ledyard had full authority to make that offer on behalf of his clients. On August 19, 1982, counsel for plaintiffs, Leonard Davis, Esquire, accepted that offer on behalf of the plaintiffs, having obtained their permission to do so. The settlement was the culmination of over a month of negotiations, with the plaintiffs

having originally asked for $2.5 million (July 10, 1982), and the defendants having originally offered $450,000 (August 13, 1982). Ledyard and Davis agreed that Davis would notify the court of the settlement, which he did that same day. It was further agreed that Davis would set down the agreement in writing in a letter to Ledyard, which would include, as terms: (1) that Chris-Craft would pay the plaintiffs $1,040,000 within ten days; (2) that Chris-Craft would pay all court costs; (3) that Chris-Craft would execute releases of plaintiffs for any contribution claims; and (4) that Chris-Craft would provide necessary indemnity agreements, to preclude the necessity of any of the settlement money having to be held in trust under an indemnity agreement previously entered into between plaintiffs and a former additional defendant in this case (Outboard Marine Corporation). Davis wrote and sent the letter the same day. Ledyard testified that he had no doubt at that time that the case had been settled.

Jury selection did not take place on August 20, because of the settlement.

Davis's letter arrived in Ledyard's office on August 20, and was read by Ledyard on August 24. Ledyard testified that the letter accurately reflected his understanding of the settlement. At that time, Ledyard advised his client of the settlement and ordered the checks "cut" and he advised plaintiffs' counsel that he had done so.

On August 25, Ledyard became aware that a new witness, who had read of the settlement in a Tyler, Texas, newspaper, had volunteered his services to the defendants, because he believed he possessed information about the accident that, in his opinion, would make the settlement unjust. Ledyard contacted the witness, Mr. Bob Jernigan, found his information credible, and notified Chris-Craft. On August 27, 1982, Ledyard notified Davis that Chris-Craft was not going to tender the checks, on the basis of the new witness's information about the accident.

Plaintiffs moved this court to enforce settlement-on August 30, 1982, after the expiration of the ten day period during which, according to the settlement, Chris-Craft was to have tendered the checks. Depositions were taken, and on September 8 and 9, 1982, a plenary hearing was held on the question of whether or not the settlement should be enforced or set aside.

## II.

### The Evidence Presented at the Plenary Hearing

The new witness, Jernigan, testified that he was in a boat with six other adults and two children on Lake Tyler on July 5, 1980. He said that he saw two girls in a boat drive past his boat at a high rate of speed, perhaps twenty to thirty miles per hour, and that it was "planing," that is, the hull was down fairly level in the water. The girls were sitting on the tops of the backs of their seats, which seemed dangerous to him, especially since the boat had no safety rails. He said the driver had something in her right hand (a cup or glass), and the girls were conversing. One of the women in his own party commented that the girl in the other boat was driving with her feet, at which time Jernigan looked and saw that she was. The girls' boat came within about thirty yards of Jernigan's boat. After the boat passed, Jernigan turned his attention back to his own boat, which was about to pull up a skier. About a minute later, he noticed that a very serious accident had taken place, apparently involving the same boat that had passed them. The boat was circling, and rescuers were already on their way. Jernigan could not identify the plaintiffs as the girls he saw. Jernigan said that the girls he saw were wearing two-piece bathing suits, although both plaintiffs testified that they were wearing one-piece suits. Jernigan did not see the accident and, consequently, he did not observe the speed of the boat or the manner in which it was being operated at the moment of the accident.

Jernigan, who was a licensed minister at the time, gave a sermon the next morning into which he incorporated his story about the accident. At the plenary hearing, excerpts of the tape were played in which Jernigan described the same events, including his observation that the girl was driving with her feet. He also described on the tape his theory of how the accident occurred, although neither he nor any member of his party saw it.

Jernigan's wife, Mrs. Jody Jernigan testified that she had been the one in the Jernigan party who had commented that the girl was driving with her feet. She said she had seen the driver's foot, probably the right foot, on the bottom half of the steering wheel. She did not see the accident.

Deposition testimony of Jernigan's sister, Judy, was also entered into the record. She said she had heard someone comment that the girl was driving with her feet, but that she "did not look at the steering wheel area at all," and so she didn't know whether the girl was driving with her feet or not. She did not see how the accident occurred, but she said she turned in time to see one girl go overboard and the boat circling about 200 yards away.

Deposition testimony of Mr. David Hensarling, another member of the party, was also entered into the record. He heard that the girl was driving with her feet, and then looked and saw the girl driving with her foot or feet.

Plaintiffs, in rebuttal, both testified as to their own recollections of the accident, which were consistent with the allegations set forth in the complaint. Both reiterated, in a highly credible manner, that Holley was not driving with her feet and never had so driven the boat. Both admitted to having had two and a half tequila "sunrises" that afternoon, although they said the drinks were sitting on the dashboard at the time of the accident. Both reiterated that the boat was not going fast enough to plane, and that, therefore, the visibility problem forced them to sit on top of the backs of their seats.

Credible character witnesses testified on behalf of plaintiff Holley. Howard's truth-

fulness. Furthermore, her father testified that, during the three months she spent in the hospital following the accident, she told him everything she knew about the accident, including those elements of the accident that might have made her feel guilty—the drinks, their sitting positions—, but that she never mentioned anything about driving with her feet. It was unrebutted that, during this three month period, the plaintiff Howard underwent some thirty surgical operations, and that she was fighting for her life and not contemplating a lawsuit.

Plaintiffs also placed into evidence photographs of the interior of the boat. These photographs revealed that the steering wheel was only about six inches or less from the seat, so that someone sitting up on the top of the back of the seat would have his or her feet within inches of the lower half of the steering wheel; thus, a driver might appear to be driving with his or her feet. The photographs further revealed that the gunwales of the boat extend high enough up so that, viewed from the side (as all of the Jernigan witnesses say they viewed the boat), most of the steering wheel, and certainly the lower half of it, would be difficult or impossible to see.

The plaintiffs also admitted into evidence a videotape demonstration of the same model boat in operation, which strongly suggested that, viewing the boat from thirty yards away, it would be difficult or impossible to tell whether someone, seated as the plaintiffs were seated, was driving with his feet. (The videotape was also highly persuasive as to the proposition that, prior to a "planing" speed, it would be necessary for the driver to sit on the top of the back of the seat to see adequately.)

Finally, it remained uncontested that plaintiffs' boat was not equipped with a kill-switch.

## III.

### *The Law Concerning Settlement Agreements*

Although defendants in their brief made a pro forma argument that there was no binding settlement, they wisely dropped that contention at the plenary hearing. There was an offer, an acceptance, and consideration.[1] Both attorneys acted with the full authority of their clients. There was, therefore, a settlement of this case on August 19, 1982.

■ Compromises of disputed claims are much favored by courts. *Williams v. First National Bank,* 216 U.S. 582, 30 S.Ct. 441, 54 L.Ed. 625 (1910), *Insurance Concepts, Inc. v. Western Life Ins. Co.,* 639 F.2d 1108 (5th Cir.1981), *J. Kahn and Co., Inc. v. Clark,* 178 F.2d 111 (5th Cir.1949). "The law is that every reasonable presumption will be indulged in favor of a settlement made by an attorney duly employed." *Fail v. Lee,* 535 S.W.2d 203, 208 (Tex.Civ.App.—Ft. Worth 1976). Plaintiffs have moved the court to enforce that settlement agreement. Federal courts have the inherent power to summarily enforce settlement agreements entered into by the parties litigant in a pending case. "Federal courts have held under a great variety of circumstances that a settlement agreement once entered into cannot be repudiated by either party and will be summarily enforced." *Cia Anon Venezolana de Navegacion v. Harris,* 374 F.2d 33, 35 (5th Cir.1967). *See also Hennessy v. Bacon,* 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605 (1890); *Kelly v. Greer,* 365 F.2d 669 (3d Cir.1966); *All States Investors, Inc. v. Bakers Bond Co.,* 343 F.2d 618 (6th Cir. 1965); *Cummins Diesel Michigan, Inc. v. The Falcon,* 305 F.2d 721 (7th Cir.1962).

The defendants have urged the court, however, to set aside the settlement, on grounds that it was induced by the fraudulent misrepresentations of plaintiffs. Furthermore, they have argued that, under Texas law, a judgment cannot be entered

---

1. Mutual agreement of compromise is, in itself, valuable consideration. *Williams v. Employers Mut. Casualty Co.,* 368 S.W.2d 122, 124 (Tex. Civ.App.—San Antonio 1963); *Gillman v. Gill-man,* 313 S.W.2d 931, 942 (Tex.Civ.App.—Amarillo 1958, writ ref. n.r.e.); *Little v. Allen,* 56 Tex. 133, 138 (1882).

upon a settlement, if one of the parties to the settlement no longer consents to it at the time of entry of judgment. In view of the seriousness of the allegation of fraud, it was decided to hold a plenary hearing on the question of whether to enforce the settlement, rather than to enforce it summarily. After receiving evidence and hearing argument, however, it is plain that both of defendants' contentions are without merit.

### A. *The allegation of fraud*

■ A settlement induced by fraud may be set aside. *National Security Life and Casualty Company v. Benham,* 233 S.W.2d 334 (Tex.Civ.App.—Amarillo 1950, writ ref. n.r.e.); *MacKintosh v. T.E.I.A.,* 486 S.W.2d 148 (Tex.Civ.App.—Dallas 1972, writ ref. n.r.e.). *See also, Clarion Corp. v. American Home Products Corp.,* 494 F.2d 860 (7th Cir.1974), *cert. denied* 419 U.S. 870, 95 S.Ct. 128, 42 L.Ed.2d 108, *reh. denied* 419 U.S. 1027, 95 S.Ct. 508, 42 L.Ed.2d 303 (1974).

■ A settlement will not be set aside, however, merely because one party's case becomes stronger after the settlement is concluded. "The actual merits of the case as presented by the pleadings were no longer of any consequence following the agreement." *Cia Anon Venezolana de Navegacion v. Harris,* 374 F.2d at 35. *Hennessy v. Bacon, supra; J. Kahn and Co., Inc. v. Clark, supra; National Maritime Union v. Altman,* 568 S.W.2d 441 (Tex.Civ.App.—Beaumont 1978, writ ref. n.r.e.).

■ The party who would overturn a settlement on grounds of fraud faces a stiff standard of proof. The defendants' task has been articulated by the Seventh Circuit in the following terms:

One who relies upon fraud, misrepresentation or concealment [to set aside a settlement agreement] must sufficiently allege facts and prove it. The allegations and proof must be *clear and convincing* and must show (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of the falsity or ignorance of its truth, (5) his intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, and (8) his right to rely thereon.

*Clarion Corp. v. American Home Products,* 494 F.2d at 864–865 (emphasis in original).

■ Chris-Craft's allegation of fraud in this case focuses upon plaintiffs' statements on deposition that Holley Howard was not driving the boat with her feet on the day of the accident. The plaintiffs have never retreated from those statements, and both reiterated at the plenary hearing that Holley Evans Howard had never operated the boat in that fashion. (Plaintiff Sarah Donaldson did not drive the boat.) Plaintiffs also presented highly probative evidence at the hearing suggesting the difficulty or impossibility of the new witnesses actually having seen what they thought they saw. Furthermore, the possibility remained that, on that crowded lake on a Fourth of July weekend, the Jernigan party could have observed a different boat or a different accident. The inconsistencies in the account of the accident as described by the plaintiffs and the Jernigans do not suggest fraud at all, but, rather, the routine good faith discrepancies in recollection that typically occur in the trial of any lawsuit. If adverse parties always agreed upon the facts, no case would ever need be tried. The issue of "perjury" was not broached at the plenary hearing, nor would such a term have been welcome there.

■ More importantly, defense counsel already knew about the new witnesses' theory of the accident *before* the time of the settlement. Ledyard testified that he heard from rumor and hearsay that one of the plaintiffs had been driving with her feet. Unable to introduce that hearsay and rumor evidence, Ledyard nevertheless could and did proceed to gather other admissible evidence suggesting the same thing, that plaintiffs were misusing the boat—including the undisputed evidence of the alcoholic beverages, the undoubted precariousness of the plaintiffs' positions in the boat, and the testimony of expert witnesses. Moreover, at the plenary hearing, Ledyard

expressly stated that, as his conduct would suggest, *he never believed plaintiffs' account* of the accident. Accordingly, even if plaintiffs' statements were false—which is, of course, not proven,—and even if they were intentionally false—*a fortiori*, not proven,—defendants could still not have been defrauded by plaintiffs *as a matter of law*, since they never believed plaintiffs' representations.

> The authorities are in accord in holding that to entitle one to avoid a contract or settlement on the ground that he was induced to enter into it on the faith of false representations, it is essential that he should have been ignorant of the falsity of such representations, and should have relied on the truth thereof. If, before he acted upon such representations, he discovered that they were false, he cannot claim that he was deceived and thereby avoid such contract or settlement.

*Allen v. Lasseter,* 35 S.W.2d 753, 757 (Tex. Civ.App.—Waco 1931, writ ref'd). *See also Texas Employers Insurance Ass'n v. Hardy,* 81 S.W.2d 191 (Tex.Civ.App.—Eastland 1935, writ dism'd w.o.j.); *Morris v. Owen,* 143 S.W. 227 (Tex.Civ.App.—Amarillo 1911); *Clarion Corp. v. American Home Products, supra.*

Although the newly discovered witnesses might strengthen defendants' case were it still going to trial,[2] they do not establish that previously existing evidence was false or fraudulent. In any event defendants concede that they were not defrauded by plaintiffs' testimony even if it was false, since they always assumed that plaintiffs' testimony was false.[3]

---

**2.** It is observed, however, that after hearing defendants' newly discovered witnesses and plaintiffs' rebuttals to them at the plenary hearing, and considering that the cause of action is one sounding in strict liability in tort, it is entirely possible that this case, if tried to a jury, would result in a verdict for plaintiffs exceeding the settlement figure.

**3.** Although Texas law permits the issue of fraudulent inducement of settlement to be submitted to a jury, such a procedure is inappro-

### B. *The power of this court to enforce the settlement*

Chris-Craft also argues that, under Texas law, a court cannot enforce a settlement, if one party no longer wishes to be bound by that settlement at the time of entry of judgment.

■ Even if this extravagant proposition were the law of Texas—and it plainly is not—, it is doubtful that Texas law would preclude a federal court from exercising its inherent power to enforce settlements entered into by the parties before it. *See, e.g., Cia Anon Venezolana de Navegacion, supra; Clarion Corp., supra; Cummins Diesel Michigan, Inc. v. The Falcon, supra.* The Fifth Circuit draws the following distinction:

> Although Federal Courts possess the power to enforce agreements entered into in settlement of litigation, the construction and enforcement of settlement agreements is governed by principles of State law applicable to contracts generally.

*Lee v. Hunt,* 631 F.2d 1171 (5th Cir.1980). Admittedly, the meaning of this excerpt is somewhat ambiguous, since the word "enforce" appears in each of the two antithetical clauses of the sentence. Nevertheless, it is apparent that defendants in this case are arguing that state law obstructs this court's "power to enforce agreements entered into in settlement of litigation." This proposition cannot be accepted. It is apparent that the Texas law of contracts says nothing about the procedural prerequisites of entering a judgment in a federal court. Just as the commencement of a federal lawsuit is determined by federal law, F.R. Civ.P. 3, it is logical that the culmination of one would also be so governed.

---

priate in cases such as this one, in which the undisputed facts establish that there was no fraud as a matter of law. *Fail v. Lee,* 535 S.W.2d 203 (Tex.Civ.App.—Ft. Worth 1976); *National Maritime Union v. Altman,* 568 S.W.2d 441 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.). Furthermore, neither plaintiffs nor defendants requested that a jury decide any of the issues of fact presented at the plenary hearing.

In any event, Chris-Craft has incorrectly characterized Texas law, which, properly interpreted, poses no obstacle to enforcing the settlement in this case. Defendants rely upon *Burnaman v. Heaton,* 240 S.W.2d 288 (Tex.1951), which involved the question of whether a trial court could enter a "consent judgment" based upon a settlement agreement that the plaintiff claimed she had never authorized her attorney to make. In that context, the Supreme Court of Texas reversed the trial court, holding that

A valid consent judgment cannot be rendered by a Court when consent of one of the parties thereto is wanting. It is not sufficient to support the [consent] judgment that a party's consent thereto may at one time have been given; consent must exist at the very moment the court undertakes to make the agreement the judgment of the court.

240 S.W.2d at 291.

*Burnaman* is a definitive statement of Texas law as to the entry of consent judgments, which are judgments in which parties conclude a cause of action by consenting to the wording of a judgment. The plaintiffs Holly Evans Howard and Sarah Donaldson have not, however, moved for entry of a consent judgment, which would be a judgment entered upon their original products liability cause of action against the defendants. Rather, they have moved to enforce the settlement agreement, which is in the nature of an ancillary independent action for specific performance of a contract. *Stewart v. Mathes,* 528 S.W.2d 116 (Tex.Civ.App.—Beaumont 1975, writ ref'd n.r.e.). *National Maritime Union v. Altman, supra.* Texas courts have made it clear that *Burnaman* and its progeny are restricted in their application to consent judgments, and do not invalidate compromise settlement agreements or preclude a court from entering judgment thereon.

In *Stewart v. Mathes, supra,* the court considered the case of a plaintiff who, after agreeing to settle her claim against Mathes's estate, decided to repudiate that settlement prior to entry of judgment. Distinguishing *Burnaman,* the *Stewart* court wrote:

An examination of [*Burnaman*] demonstrates that the Court there was holding the consent judgment invalid and *not* the settlement agreement.... The import of *Burnaman* is that while a party can enter into a *valid and binding* settlement pending disposition of a case, a trial court cannot enter into a *consent judgment* which incorporates the terms of the agreement if one of the parties thereto withdraws consent prior to entry of judgment. This does *not* render the settlement agreement or its enforceability invalid—only a judgment entered in the above manner.

528 S.W.2d at 118 (emphasis in original). The *Stewart* court enunciated sound policy considerations in reaching its decision:

A contrary ruling on the facts of this case would place a heavy burden on the party who has relied upon the opposing parties' acceptance of the settlement agreement only to find that the parties subsequently withdraw such consent at the time of their convenience. Moreover, we take judicial knowledge of the fact that many settlement agreements are entered into by parties during the progress of contested trials. A party should not be permitted to enter into such a contract, perhaps to avoid an unexpected development during the trial, and then to be allowed to repudiate the agreement before the written judgment can be prepared for entry. Fairness to all the parties, as well as conservation of judicial time, energy and expense is achieved by holding the parties to the contract of settlement which they made.

528 S.W.2d at 119.

Texas courts have consistently followed the *Stewart* approach, where confronted with a motion to enforce a settlement agreement rather than a motion to enter a consent judgment. *National Maritime Union v. Altman, supra* (settlement of claim for benefits under union pension plan would be summarily enforced, though defendant attempted to repudiate settlement when its New York office discovered new evidence

demonstrating that plaintiff was entitled to much less); *Fail v. Lee, supra,* ("An offer [of settlement] becomes a binding contract when it is accepted by the other party according to its terms. After it is accepted, it cannot be withdrawn."); *Angelina Casualty Co. v. Bennett,* 415 S.W.2d 271, 275 (Tex. Civ.App.—Houston 1967) ("The established rule relating to 'consent judgments' in general, as enunciated in *Burnaman v. Heaton,* . . . has no application to compromise settlements"); *Esco v. Argonaut Ins. Co.,* 405 S.W.2d 860 (Tex.Civ.App.—Beaumont 1966, writ ref'd n.r.e.). *See also Burnaman,* 240 S.W.2d at 292 ("the reversal of the [consent] judgment should be without prejudice to the right of defendants to plead the agreement in bar of plaintiff's suit").

The settlement agreement of August 19, 1982—untainted by fraud and entered into in good faith by counsel fully authorized to so act on behalf of the parties—can and must be enforced.

### Relief

In addition to plaintiffs' request that judgment be entered upon the settlement agreement of August 19, 1982—which will be granted,—plaintiffs have also asked for interest, attorney's fees, and damages for pain and suffering inflicted upon plaintiffs by defendants' breach of the settlement agreement.

 The damages awarded for a breach of contract should return the wronged party as nearly as possible to the position he or she would have occupied had the contract not been violated. *Smith v. Kinslow,* 598 S.W.2d 910 (Tex.Civ.App.—Dallas 1980); *Pletz v. Christian Herald Ass'n, Inc.,* 486 F.2d 94 (5th Cir.1973) (applying Texas law). The fulfillment of this principle requires an award of interest. *Republic Bankers Life Ins. Co. v. Jaeger,* 551 S.W.2d 30, 31 (Tex.1976). Although the defendants repudiated the settlement agreement on August 27, 1981, the award of interest in this case will be calculated from August 29, the tenth day after the settlement, since the settlement called for performance within ten days. In accord-

ance with Texas law, interest will be awarded at six percent. Tex.Rev.Civ.Stat. Ann. art. 5069–1.03 (Vernon Supp. 1971–1981). *See Colonial Refrigerated Transportation, Inc. v. Mitchell,* 403 F.2d 541 (5th Cir.1968) (applying Texas law).

 Damages for pain and suffering are not normally recoverable for a breach of contract. The measure of such damages is generally confined to "the pecuniary loss shown to have been within the contemplation of the parties." *Frederickson v. Cochran,* 449 S.W.2d 329, 332 (Tex.Civ.App.—Beaumont 1969, writ ref'd n.r.e.). The pain and suffering plaintiffs have alleged in this case had its source in plaintiffs' actual belief (which presumably was not the belief of their counsel) that the settlement amounted to an acknowledgment by Chris-Craft of wrongdoing, as well as an implied commitment by Chris-Craft to see that accidents like plaintiffs' could not be repeated. The breach of the settlement, combined with Chris-Craft's attempt to capitalize on the newly discovered witnesses to attempt to evade all liability, caused the pain and suffering plaintiffs complain of. Plaintiffs' injury is not legally cognizable, since Chris-Craft's settlement did not legally represent any such acknowledgment of wrongdoing.

 Plaintiffs have also asked for attorney's fees upon two theories. The first theory is that defendants, in breaching their settlement agreement, acted in such bad faith as to warrant this court in the exercise of its equity powers, to award plaintiffs the attorney's fees expended upon enforcing that settlement. The Supreme Court has, in fact, held that federal courts may award attorney's fees to a successful litigant when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). Plaintiffs argue that defendants' "repudiation of an enforceable settlement contract without a valid basis could only constitute bad faith and vexatious conduct." That proposition must be rejected. Although pertinent law, upon inspection, proved to be

against the defendants, and decisively so, it does not follow that defendants knew or could have known that they were not acting within their legal rights.

The plaintiffs' additional allegation, *i.e.*, that defendants accepted and then repudiated the settlement, as a dilatory tactic designed to continue the case until the next trial session, must be rejected on the facts. It is found as a fact—indeed, it was virtually undisputed at the plenary hearing—that the newly discovered witnesses were the sole cause of Chris-Craft's repudiation of the settlement. Accordingly, an award of attorney's fees premised upon defendants' bad faith is not warranted in this case.

Plaintiffs also claim that they are entitled to attorney's fees under Tex.Rev.Civ. Stat.Ann. art. 2226 (Vernon Supp.1982), which they contend is binding upon a federal court sitting in diversity. *Alyeska Pipeline Service v. Wilderness Society*, 421 U.S. 240, 258 n. 31, 95 S.Ct. 1612, 1622, n. 31, 44 L.Ed.2d 141 (1975). Article 2226 provides that:

> any person ... having a valid claim against a person or corporation for services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured, or suits founded upon a sworn account or accounts, or suits founded on oral or written contracts, may present the same to such persons ... and if, at the expiration of 30 days thereafter, payment for the just amount owing has not been tendered, the claimant may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees ....

Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon Supp.1982).

The time is not yet ripe to decide whether Texas courts would interpret art. 2226 to permit recovery in a case such as this one, since it is undisputed that the thirty day period for tender to the claimant has not yet expired. *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex.1981). If defendants still have not tendered payment by September 28, 1982, thirty-one days following plaintiffs' oral presentment of their valid claim, *Jones v. Kelley*, 614 S.W.2d at 100 (oral request for payment meets presentment requirement of art. 2226), a nonadvisory opinion will be rendered upon the issue at that time.

An order will be entered in accordance with the findings of fact and conclusions of law herein made.